**LOWDON PTY LTD., et al., Plaintiffs and Counterclaim Defendants,**

v.

**WESTMINSTER CERAMICS, LLC, Defendant and Counterclaim Plaintiff,**

v.

**Peter Maniscalco and Roberto Maniscalco, Counterclaim Defendants.**

Civil Action No. 1:06–CV–2754–MHS.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 25, 2008.

See, also, 2007 WL 4618386.

Dean Andrew Calloway, Jordana Rachel Sternberg, Joseph E. Finley, Jones Day, Brandon Jay Witkow, Michael P. Bruyere, Locke Lord Bissell & Liddell, LLP–ATL, Atlanta, GA, for Plaintiffs and Counterclaim Defendants.

Henry D. Fellows, Jr., Eugenia Wooten Iredale, Fellows LaBriola LLP, Atlanta, GA, for Defendant.

## ORDER

MARVIN H. SHOOB, Senior District Judge.

This action is before the Court on counterclaim defendant Roberto Maniscalco's motion to dismiss and plaintiffs' motion for summary judgment. For the following reasons, the Court denies the motion to dismiss and grants in part and denies in part the motion for summary judgment.

*Background*

Plaintiffs Lowdon PTY Ltd., an Australian corporation trading as Artistic Stone, and Artistic Stone PVT Ltd. and Artistic Tiles PVT Ltd., both Indian corporations (collectively, "Artistic Stone"), are engaged in the sale and distribution of goods, including stone tiles and other flooring materials, to wholesale and retail customers. Defendant Westminster Ceramics LLC (Westminster), a Georgia limited liability company, is a designer, manufacturer, and distributor of ceramic tiles, stone, metal, and glass products used for walls and flooring in residential and commercial buildings.

In 2001, Westminster began purchasing products from Artistic Stone mainly for sale to home improvement stores such as Home Depot and Lowe's. Each plaintiff sold goods, including stone tiles and other flooring materials, to Westminster on open commercial account.

On November 13, 2006, plaintiffs filed this action against Westminster seeking to recover $2,439,203.95, plus prejudgment interest and litigation expenses, for goods purchased and received but not paid for by

defendant. Westminster answered and filed a counterclaim against plaintiffs. In addition, Westminster named as counterclaim defendants Peter Maniscalco, the managing director of Lowdon PTY and part owner of all three plaintiffs; and Peter's son, Roberto Maniscalco, president of Artistic Stone Gallery, Inc., a distributor of natural stone products based in Menlo Park, California.

In its counterclaim, Westminster alleges that in 2005 Artistic Stone entered into negotiations to purchase Westminster. In connection with these negotiations, on May 2, 2005, Peter Maniscalco executed a Confidentiality Agreement on behalf of Artistic Stone, and in the presence of Roberto Maniscalco,[1] under which they agreed (1) to keep confidential all information (referred to as "Evaluation Material") acquired from Westminster during the negotiations; (2) not to use the Evaluation Material in any way directly or indirectly detrimental to Westminster; and (3) for a period of eighteen months after the signing of the Confidentiality Agreement, not to employ or attempt to employ any management employee or sales representative of Westminster.

In June 2005, Artistic Stone made an offer to purchase substantially all of Westminster's assets for $48 million, primarily in the form of a series of promissory notes. In July 2005, Westminster rejected the offer. Thereafter, Westminster alleges, "Artistic Stone, Peter Maniscalco, and Roberto Maniscalco breached the Confidentiality Agreement and began to engage in a series of illegal actions to destroy the business of Westminster Ceramics, hire its corporate officers, cause its corporate officers to breach their fiduciary duties to Westminster Ceramics, capture its major customer, Home Depot, and otherwise to steal the business that they were unable to secure by legitimate means through mutual agreement on the offered terms." (Countercl. ¶ 24.)

Specifically, Westminster alleges that Artistic Stone, Peter Maniscalco, and Roberto Maniscalco induced Eric Hunger, its President and Chief Operating Officer, and Thomas Mason, its Senior Vice President of Sales, while they were still employed by Westminster, to become part of a competitive business venture known as Terra Opus, which was financed by Artistic Stone and the Maniscalcos. In January 2006, Hunger and Mason left their employment with Westminster and became executives with Terra Opus.

Westminster alleges that Artistic Stone and the Maniscalcos aided and abetted Hunger, Mason, and Terra Opus in "[1] wrongfully taking, misappropriating, and converting computer data, information, and other property belong to Westminster Ceramics, including information regarding its customers, vendors, pricing, shipping, strategy, financial forecasts, packaging, marketing, merchandising programs, and product designs, for the purpose of causing customers to terminate their relationships with Westminster Ceramics and instead enter into contractual relationships with Terra Opus[;] ... [2] improperly remov-

---

1. Roberto Maniscalco did not execute the Confidentiality Agreement and is not named as a party to the agreement. However, Artistic Stone agreed that "prior to giving any of its Representatives ... access to any of the Evaluation Material, it shall require each such Representative to be bound by the terms of this Agreement to the same extent as if they were parties hereto." The agreement defines "Representatives" as Artistic Stone's "directors, officers, employees, partners, affiliates, agents, advisors, shareholders, members, owners, or other representatives...." (Answer, Defenses & Countercl., Ex. A.)

ing, electronically copying, downloading, deleting, altering, and damaging the confidential, proprietary data and information on Westminster Ceramics' computer system for the purpose of causing customers to terminate their relationships with Westminster Ceramics and for the purpose of damaging the business of Westminster Ceramics[;] ... [and][3] using Westminster Ceramics' confidential, proprietary data and information to solicit Westminster Ceramics' customers, to solicit Westminster Ceramics' employees to leave the Company and join Terra Opus, and to cause difficulties in the business operations of Westminster Ceramics." [2] (Countercl. ¶¶ 64–65, 67.) As a result of the alleged wrongful conduct of Artistic Stone and the Maniscalcos, Westminster claims to have suffered actual damages in excess of $11 million.

*Discussion*

## I. Motion to Dismiss

Counterclaim defendant Roberto Maniscalco, a citizen and resident of Australia, moves to dismiss Westminster's claims against him on grounds of lack of personal jurisdiction and insufficiency of service of process. Roberto Maniscalco claims that he lacks the requisite minimum contacts with the state of Georgia to permit the exercise of jurisdiction over him. Alternatively, he argues that the counterclaim should be dismissed against him because he was never personally served.

In response, Westminster contends that Roberto Maniscalco established the requisite minimum contacts with Georgia by visiting the state in 2002, meeting with Mr. Hunger in Georgia in 2005, visiting the offices of Terra Opus in Georgia in 2006, communicating extensively via email with individuals in Georgia in connection with his efforts to establish Terra Opus, and wire-transferring funds to Terra Opus in Georgia. Moreover, Westminster contends that Roberto Maniscalco was personally served at his office in Australia with a summons and a copy of the counterclaim.

### A. Personal Jurisdiction

Westminster bears the burden of establishing jurisdiction in this Court. *Peridyne Tech. Solutions, LLC v. Matheson Fast Freight, Inc.*, 117 F.Supp.2d 1366, 1369 (N.D.Ga.2000) (citation omitted). Since the Court has not held an evidentiary hearing on the motion to dismiss, Westminster must establish only a prima facie case of jurisdiction by presenting sufficient evidence to withstand a motion for directed verdict. *Id.* The Court construes the allegations in the counterclaim as true to the extent that they are uncontroverted by the movant's evidence. *Id.* Where there are conflicts in the evidence, the Court draws all reasonable inferences in favor of the non-movant. *Id.*

Westminster relies, in part, on the "transacting any business" prong of the Georgia long-arm statute, O.C.G.A. § 9–10–91(1), as the basis for asserting personal jurisdiction over Roberto Maniscalco.[3] That subsection confers personal jurisdic-

---

**2.** In April 2006, Westminster sued Hunger, Mason, and Terra Opus and obtained a temporary restraining order (TRO) requiring defendants, among other things, to return all proprietary information taken from Westminster and to cease doing business with Home Depot. On May 2, 2006, the court entered a Consent Order and Judgment making the TRO permanent and prohibiting defendants from doing business with Home Depot for two years.

**3.** The Court finds it unnecessary to address whether jurisdiction exists under any other provisions of the Georgia long-arm statute.

tion over nonresident defendants "to the maximum extent permitted by procedural due process." *Innovative Clinical & Consulting Serv's v. First Nat'l Bank of Ames, Iowa,* 279 Ga. 672, 675, 620 S.E.2d 352 (2005)(quoting *Coe & Payne Co. v. Wood–Mosaic Corp.,* 230 Ga. 58, 60, 195 S.E.2d 399 (1973)). Therefore, the Court's jurisdictional inquiry is limited to the constitutional question of whether assertion of jurisdiction over Roberto Maniscalco comports with the requirements of due process.

The Court considers two factors when determining if asserting personal jurisdiction over a nonresident defendant comports with due process: (1) whether the nonresident defendant has purposefully established minimum contacts with the forum, and (2) whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. *CareKeeper Software Dev. Co. v. Silver,* 46 F.Supp.2d 1366, 1369 (N.D.Ga.1999). The Court concludes that both factors support the exercise of jurisdiction over Roberto Maniscalco in this case.

■ First, to satisfy minimum contacts for the purposes of specific jurisdiction,[4]

the contacts must (1) be related to plaintiff's cause of action; (2) involve some act of "purposeful availment" by the defendant of the privileges of the forum; and (3) be such that the defendant should reasonably anticipate being "haled into court there." *Francosteel Corp. v. M/V Charm,* 19 F.3d 624, 627 (11th Cir.1994). In this case, there is evidence that Roberto Maniscalco visited Georgia on three occasions: once in 2002 while accompanying his father on a business trip,[5] again in 2005 to meet with Eric Hunger,[6] and again in March 2006 to visit the offices of Terra Opus.[7] (Roberto Maniscalco Decl. ¶ 4; Peter Maniscalco Dep. at 153–54; Hunger Dep. at 65–66.) In addition, in November and December 2005, Roberto Maniscalco sent a number of emails to Eric Hunger in Georgia regarding the formation and initial operation of Terra Opus. (Hunger Dep. & Peter Maniscalco Dep., Exs. 23–25, 28, 30–33, 35–36, 39, 41–42, 45, 49, 53.)

■ The Court finds that Roberto Maniscalco's trips to Georgia to meet with Eric Hunger and to visit the offices of Terra Opus, together with the emails that Roberto Maniscalco sent to Eric Hunger regard-

---

**4.** Specific jurisdiction is jurisdiction exercised over a defendant in a suit arising out of or related to the defendant's contacts with the forum. General jurisdiction, on the other hand, is jurisdiction which may be exercised over a defendant in a suit which does not arise out of the defendant's contact with the forum. *CareKeeper,* 46 F.Supp.2d at 1370. In this case, Westminster contends that its claims against Roberto Maniscalco arise directly out of or are related to his contacts with Georgia. Therefore, although Westminster contends that the exercise of general jurisdiction is also appropriate, the Court will treat this as a case of specific jurisdiction.

**5.** This visit occurred while Roberto was still a student and not a full-time employee of Lowdon PTY, and before the formation of Artistic Stone Gallery. (Roberto Maniscalco Decl.

¶ 4.) There is no evidence that Roberto transacted any business during this visit.

**6.** The evidence does not indicate precisely when this meeting took place or the purpose of the meeting. However, since there is no evidence of any personal relationship between Mr. Maniscalco and Mr. Hunger, it is reasonable to infer that the meeting had a business purpose.

**7.** Peter Maniscalco characterized the purpose of Roberto's visit to Terra Opus as "[j]ust to come and have a look at the place." (Peter Maniscalco Dep. at 154.) Absent evidence of some other purpose, it is reasonable to infer that the reasons for the visit were business-related.

ing the formation and initial operations of Terra Opus, are sufficient to satisfy the minimum contacts requirement. First, these contacts are related to Westminster's counterclaim. The emails sent by Roberto Maniscalco to Eric Hunger, at a time when Mr. Hunger was still employed by Westminster, concerned the formation and initial operation of Terra Opus, a matter that lies at the very heart of Westminster's counterclaim. Moreover, Roberto Maniscalco's two business trips to Georgia came at the same time that the events underlying Westminster's counterclaim were unfolding and involved two of the key parties in those events—Eric Hunger and Terra Opus. Second, by conducting business in Georgia via emails directed to Eric Hunger, and by traveling to Georgia for business meetings with Mr. Hunger and Terra Opus, Roberto Maniscalco purposefully availed himself of the privilege of doing business in Georgia, and therefore should have reasonably anticipated the possibility of being haled into court here.

Roberto Maniscalco's claim that email communications are an insufficient basis for asserting personal jurisdiction is without merit. In *Innovative Clinical & Consulting Serv's*, 279 Ga. at 675, 620 S.E.2d 352, the Georgia Supreme Court held that nothing in the "transacting any business" prong of Georgia's long-arm statute "requires the physical presence of the nonresident in Georgia or minimizes the import of a nonresident's intangible contacts with the State." Roberto Maniscalco also argues that all of his contacts with Georgia were in his capacity as a corporate representative of Artistic Stone, and not in his individual capacity, and thus cannot support jurisdiction over him individually. This argument is also without merit. As Judge Carnes explained in response to the same argument in another case:

This argument equivocates between two uses of the word "individual." To say that each defendant's contacts with the forum state must be assessed "individually" simply means that "jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him." For example, Georgia has no jurisdiction over an individual whose sole connection to the state is the fact that he has an ownership stake in a corporation over which Georgia could assert personal jurisdiction. Employing this analysis does not require a court to classify each contact as taken in either an "individual" or "official" capacity, as if it were resolving a claim for damages in a civil rights suit. The *same* footnote that defendants cite for their assertion that each contact *must* be assessed individually explicitly makes this point: "[W]e today reject the suggestion that employees who act in their official capacities are somehow shielded from suit in their individual capacity." Because Ashleman personally involved himself in negotiating the sales at issue in this litigation, he has established minimum contacts with the state of Georgia.

*Jimmy Smith Racing Tires, Inc. v. Ashleman*, No. 1:05–CV–0970–JEC, 2006 WL 2699127 at *8 (Sept. 19, 2006)(quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)) (citations omitted)(emphasis in original). Here, as in *Ashleman*, because Roberto Maniscalco personally involved himself in the transactions giving rise to Westminster's counterclaim, he has established minimum contacts with the state of Georgia.

The second factor to be considered in the due process analysis is whether the

exercise of jurisdiction would offend traditional notions of fair play and substantial justice. Relevant considerations include "the burden on the defendant[ ] in defending the lawsuit, Georgia's interest in adjudicating the dispute, the plaintiff's interest in obtaining relief, and the interstate judicial system's interest in obtaining the most efficient resolution of the controversy." *Peridyne Tech. Solutions,* 117 F.Supp.2d at 1373. The burden on Roberto Maniscalco, a resident of Australia, in being required to defend this action in Georgia, while not insignificant, is substantially reduced by "modern means of communication [that will] allow him to litigate in Georgia while remaining for the majority of the time in ... [Australia]." *Id.* All of the other considerations weigh heavily in favor of exercising jurisdiction. Georgia has a clear interest in providing its residents a convenient forum for redressing injuries caused by out-of-state residents, and Westminster obviously has a strong interest in obtaining convenient and effective relief in its home forum. Finally, it is in the interest of judicial economy to resolve this dispute in one forum rather than requiring separate lawsuits. The Court concludes that the assertion of personal jurisdiction over Roberto Maniscalco comports with fair play and substantial justice.

### B. Service of Process

█ The burden is on Westminster to establish the validity of service of process on Roberto Maniscalco. *Familia De Boom v. Arosa Mercantil, S.A.,* 629 F.2d 1134, 1139 (5th Cir.1980). In determining whether this burden has been met, the Court applies the standards of proof governing motions to dismiss for lack of personal jurisdiction. *See Bell v. Integrated Health Serv's, Inc.,* No. 06–0356–WS–M, 2007 WL 274364 at *2 (S.D.Ala. Jan. 30, 2007). In that context, the defendant first bears the burden of producing affidavits that, in non-conclusory fashion, demonstrate the absence of jurisdiction. *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1269 (11th Cir.2002). The plaintiff then bears the burden of presenting "enough evidence to withstand a motion for directed verdict." *Id.* at 1268–69 (quoting *Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir.1990)). If the plaintiff presents countering evidence, "the court must construe all reasonable inferences in favor of the plaintiff." *Id.* at 1269. Absent an evidentiary hearing,[8] the plaintiff's presentation of sufficient evidence to defeat a motion for directed verdict ends the inquiry favorably to the plaintiff. *Francosteel Corp.,* 19 F.3d at 626.

The evidence submitted by the parties is in direct conflict. In his declaration, Roberto Maniscalco states that on or about June 22, 2007, he was informed by Serena Borg, the receptionist at Artistic Stone, that a package of documents had been left at the reception desk for him. (Roberto Maniscalco Decl. ¶ 9.) The package included a summons and Westminster's Answer, Defenses, and Counterclaim but not the referenced exhibits. (*Id.*) Roberto Maniscalco's account is supported by declarations filed by Ms. Borg, as well as two other employees who state that they observed an unidentified gentleman leave the package for Mr. Maniscalco on the reception desk. (Borg Decl. ¶¶ 4–5; Giuliano Decl. ¶ 4; Talwar Decl. ¶ 4.) Roberto Man-

---

8. Neither party has requested an evidentiary hearing, and the Court declines to hold one *sua sponte.*

iscalco states that he was never personally served. (Roberto Maniscalco Decl. ¶ 10.)

In response, Westminster submits the declaration of Simon Treseder, an Australian process server it retained to serve Roberto Maniscalco.[9] Mr. Treseder states that on June 21, 2007, he went to Artistic Stone's offices in Sydney, that upon arriving he called and spoke directly to Roberto Maniscalco, that as he entered the offices he saw Roberto Maniscalco talking with him on the telephone through the glass panels that separated his office from the front office where the secretaries sit, that he then ended the telephone call and asked the secretary for Roberto Maniscalco but was informed that he was not in the office, that at about the same time Roberto Maniscalco walked to the office door and Mr. Treseder called out his name, that Roberto Maniscalco confirmed who he was, and that Mr. Treseder then handed him the summons and Westminster's Answer, Defenses, and Counterclaim and the exhibits attached thereto. (Treseder Decl. ¶¶ 4–7.)

In light of the directly conflicting evidence presented by the parties, the Court construes all reasonable inferences in favor of Westminster. Doing so, it is clear that Westminster has presented sufficient evidence to defeat a motion for directed verdict on the issue of personal service. Therefore, Roberto Maniscalco's motion to dismiss for insufficiency of service of process must be denied.

## II. Motion for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court held that this burden could be met if the moving party demonstrates that there is "an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. At that point, the burden shifts to the non-moving party to go beyond the pleadings and present specific evidence giving rise to a triable issue. *Id.* at 324, 106 S.Ct. 2548.

In reviewing a motion for summary judgment, the Court must construe the evidence and all inferences drawn from the evidence in the light most favorable to the non-moving party. *WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(emphasis in original).

Plaintiffs move for summary judgment on their claim for goods sold and delivered in the total principal amount of $2,358,251.33; plus prejudgment interest in the total amount of $565,980.32 as of September 20, 2007, with an additional $35,373.77 accruing for each month thereafter beginning October 20, 2007, and continuing until the entry of judgment on

---

**9.** Mr. Treseder's declaration fails to recite that it is given "under penalty of perjury" as required by 28 U.S.C. § 1746. However, the return of service executed by Mr. Treseder and filed with the Court on July 2, 2007, includes the requisite language. Since the subsequent declaration merely expands on the circumstances of the personal service properly attested to in the return of service, the Court reads the two documents together and finds that Mr. Treseder's declaration is admissible.

their claims, at which point they will become entitled to post-judgment interest; plus $71,365.00 as their costs of litigation incurred in bringing suit against Westminster pursuant to O.C.G.A. § 13–6–11. In addition, plaintiffs seek an express determination pursuant to Fed.R.Civ.P. 54(b) that there is no just reason for delay and a direction that final judgment be entered on their claims immediately.

In response, Westminster does not dispute plaintiffs' claims for principal and prejudgment interest. However, Westminster argues that there are genuine issues of material fact precluding summary judgment on plaintiffs' claim for litigation expenses under O.C.G.A. § 13–6–11. In addition, Westminster argues that entry of final judgment on plaintiffs' claims should be delayed until its counterclaim can be adjudicated.

The Court concludes that there is no genuine issue of material fact with regard to plaintiffs' entitlement to judgment in the principal amount of $2,358,251.33 plus prejudgment interest. However, plaintiffs are not entitled to summary judgment on their claim for litigation expenses under O.C.G.A. § 13–6–11, because genuine issues of material fact remain with regard to whether Westminster is liable for litigation expenses under O.C.G.A. § 13–6–11, the amount of such expenses (if any) that is recoverable, and plaintiffs' own alleged acts of bad faith.

■ The Court also concludes that immediate entry of judgment pursuant to Rule 54(b) is not warranted. Rule 54(b) provides that "[w]hen more than one claim for relief is presented in an action, ... the court may direct entry of final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed.R.Civ.P. 54(b). The Supreme Court has outlined a two-prong analysis for determining whether a judgment should be certified under Rule 54(b): first, the Court must determine whether the judgment is final, and second, whether there is any just reason to delay entry of judgment. *Curtiss–Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 7–8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980). Although a decision to certify a judgment under Rule 54(b) is committed to the sound discretion of the district court, the Eleventh Circuit has stated that this discretion should be exercised conservatively: "Rule 54(b) certifications 'must be reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties.'" *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 166 (11th Cir.1997)(quoting *Morrison–Knudsen Co. v. Archer*, 655 F.2d 962, 965 (9th Cir.1981)(Kennedy, J.))

As to the first prong of the analysis, the judgment at issue "must be a 'judgment' in the sense that it is a decision upon a cognizable claim for relief, and it must be 'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Curtiss–Wright Corp.*, 446 U.S. at 7, 100 S.Ct. 1460 (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436, 76 S.Ct. 895, 100 L.Ed. 1297 (1956)). The Court concludes that plaintiffs' judgment against Westminster for the principal amount owing for goods sold and delivered, plus prejudgment interest, constitutes such a final

judgment.[10] Thus, plaintiffs have satisfied the first prong of the test.

As to the second prong, the Court must balance the judicial administrative interests and relevant equitable concerns. *See Curtiss–Wright Corp.*, 446 U.S. at 8, 100 S.Ct. 1460; *Ebrahimi*, 114 F.3d at 165–66. "Consideration of the former factor is necessary to ensure that application of the Rule effectively 'preserves the historic federal policy against piecemeal appeals.'" *Ebrahimi*, 114 F.3d at 166 (quoting *Mackey*, 351 U.S. at 438, 76 S.Ct. 895). "The latter factor serves to limit Rule 54(b) certification to instances in which immediate appeal would alleviate some danger of hardship or injustice associated with delay." *Id.* (citations omitted).

Judicial administrative interests include "whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." *Curtiss–Wright Corp.*, 446 U.S. at 8, 100 S.Ct. 1460 (footnote omitted). In this regard, Westminster alleges that the sales of goods at issue were the result of Eric Hunger's wrongfully shifting all of Westminster's stone purchases from multiple vendors to Artistic Stone, an action allegedly aided and abetted by the Maniscalcos and which allegedly cost Westminster $1.5 million a year more than it would have paid to the other suppliers that Mr. Hunger terminated. (Countercl. ¶¶ 40–41.) Thus, Westminster argues, plaintiffs' claims and its counterclaim "are intertwined and, if final judgment were entered, the Eleventh Circuit would have to relearn the same set of facts when the case returned to it on appeal from this Court's final judgment relative to Westminster Ceramics' Counterclaims." (Resp. in Opp'n to Mot. for Summ. J. at 18.)

This argument is without merit. Because Westminster has already admitted the amount it owes plaintiffs, and because calculating prejudgment interest is straightforward, the court of appeals will not have to learn any facts regarding Westminster's counterclaim on an appeal from a judgment for principal and prejudgment interest on plaintiffs' breach of contract claims. Thus, there will be no facts to relearn on a subsequent appeal from a judgment on Westminster's counterclaim. Accordingly, the Court finds that the judicial administrative interests indicate there is no just reason to delay entry of final judgment for plaintiffs. However, for the reasons discussed below, the Court finds that the relevant equitable considerations counsel against certification.

Relevant equitable factors include the possibility of setoff, the financial solvency of the parties, the ability of a party to collect a judgment, the length of the delay if judgment is not entered immediately, and the size of the appeal bond required if judgment is entered immediately. *See Curtiss–Wright Corp.*, 446 U.S. at 12, 100 S.Ct. 1460; *Gunter v. Hutcheson*, 497 F.Supp. 362, 363 (N.D.Ga.1980); *Canadyne–Georgia Corp. v. Bank of America*, No. 5:96–CV–114–1(DF), 2001 WL 1571002 at *2 (N.D.Ga. Dec. 5, 2001).

---

**10.** It is debatable whether a judgment for principal and prejudgment interest is final where, as here, a related claim for litigation expenses under O.C.G.A. § 13–6–11 remains pending. However, plaintiffs have agreed to waive their claim for litigation expenses if the entry of final judgment hinges on this question. (Pls.' Reply Br. at 9.) Therefore, the Court finds it unnecessary to resolve this issue. As discussed below, the Court concludes that entry of final judgment is not appropriate for other reasons.

Westminster argues that the equities weigh in favor of delaying entry of judgment because, if judgment on plaintiffs' claim is entered now, Westminster would suffer substantial financial harm, may be faced with a large appeal bond, and may lose its ability to prosecute its counterclaim. Specifically, Westminster contends that if judgment is entered now, it may have difficulty collecting on any judgment it later obtains on its counterclaim because Artistic Stone and the Maniscalcos are residents of Australia and have no assets in the United States. In addition, Westminster has submitted evidence that immediate entry of judgment would force it to restructure its business, downsize its operations, and lay off approximately 75% of its employees. Finally, Westminster argues that any delay between now and the trial of its counterclaim should be short and should not cause plaintiffs any undue hardship.

Plaintiffs, on the other hand, contend that the equities weigh in favor of immediate entry of judgment. In addition to the fact that the debts owed to plaintiffs by Westminster are liquidated and large, plaintiffs argue that further delay in collection of the amounts owed will cause them significant legal and tax problems with the Indian government. According to plaintiffs, the law of India requires that proceeds realized from the export of goods be returned to India within six months from the end of the financial year, which in India ends March 31. Because all of the goods purchased by Westminster were sold to it before March 31, 2006, the proceeds on the goods exported from India were required to be returned to India on or before September 30, 2006. As a result, plaintiffs and their agents who exported goods from India are subject to the imposition of sanctions under Indian law. Additionally, taxes on the proceeds from the goods Westminster bought are now long overdue but cannot be paid until plaintiffs receive payment from Westminster. Plaintiffs argue that postponing entry of final judgment until after adjudication of Westminster's counterclaim will result in further significant delay, further exacerbating these problems.

Although there are significant equitable interests on both sides, the Court concludes that the balance of the equities weighs against certification under Rule 54(b). It is undisputed that immediate entry of judgment would cause Westminster substantial financial harm and result in a large percentage of its employees losing their jobs. There is also a significant likelihood that Westminster would no longer be able to prosecute its counterclaim, and even if it could and it did so successfully, Westminster might be unable to collect on its judgment. On the other hand, the harm to plaintiffs from a delay in entry of judgment, although real, is more speculative. There is no indication as to when, or if, sanctions are likely to be imposed on plaintiffs due to the alleged violations of Indian law caused by the nonpayment of amounts owed by Westminster. In addition, while the adjudication of Westminster's counterclaim will result in some further delay, the Court believes that this case can be made ready for trial well before the end of the year. This further delay is not significant enough to outweigh the substantial harmful impact that immediate entry of judgment would have on Westminster.

*Summary*

For the foregoing reasons, the Court DENIES counterclaim defendant Roberto Maniscalco's motion to dismiss [# 102], GRANTS IN PART and DENIES IN

PART plaintiffs' motion for summary judgment [# 109], and DENIES plaintiffs' request for immediate entry of final judgment under Fed.R.Civ.P. 54(b).